2025 IL App (4th) 230597
NO. 4-23-0597
IN THE APPELLATE COURT
FOURTH DISTRICT

FILED
February 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| NICKLES T. PARKS, | ) | No. 19CF211 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ronald J. White, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court, with opinion.
Justices Lannerd and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1 In January 2019, the State charged defendant, Nickles T. Parks, with first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)), armed robbery (*id.* § 18-2(a)(4)), and concealment of a homicidal death (*id.* § 9-3.4(a)) in connection with the fatal shooting of Jaime Stephens in December 2018. In March 2022, a jury trial was conducted, at which the State proceeded under a theory of accountability. The jury found defendant guilty of first degree murder and concealment of a homicidal death. The trial court sentenced defendant to a total of 60 years' imprisonment.

¶ 2 Defendant appeals, arguing (1) the trial court erred in denying his motion to suppress statements made during a recorded police interview wherein he received ineffective assistance from his attorney, rendering his statements involuntary, due to the eliciting of highly incriminating statements in violation of the attorney-client privilege and in the absence of a

cooperation agreement with the State (and while operating under a *per se* conflict of interest); (2) his trial counsel provided ineffective assistance through only basing this motion to suppress on the conflict of interest and not on the initial attorney's conduct during the interview that rendered defendant's statements involuntary; (3) the court erred in denying his motion to suppress evidence of statements he made during an earlier, unrecorded police interview; (4) his trial counsel provided ineffective assistance through failing to raise and argue the affirmative defense of self-defense; and (5) the cumulative effect of these errors deprived him of a fair trial. For the reasons that follow, we conclude the first and second issues are dispositive of this appeal and reverse and remand for a new trial on these bases.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Initial Investigation and Defendant's Charges

¶ 5          On December 7, 2018, Stephens was shot 10 times and killed inside defendant's Chrysler 300 automobile outside a Walgreens in Rockford, Illinois. Defendant was driving, his friend Joshua Whittie was in the front passenger seat, and Stephens was in the back seat behind defendant. On December 10, 2018, police discovered Stephens's body in a ditch in rural Winnebago County. During their ensuing investigation, police learned Stephens was last seen on December 7 exiting Walgreens and entering the back seat of defendant's car.

¶ 6          Defendant worked for a trucking company headquartered in Rockford. On January 6, 2019, after he returned to Rockford from an out-of-state driving assignment, detectives from the Winnebago County Sheriff's Office met defendant and asked him to accompany them to the police station to discuss an ongoing criminal investigation. Defendant agreed and, later that day, participated in an unrecorded interview with detectives. On January 23, 2019, the State filed a complaint charging defendant with first degree murder (*id.* § 9-1(a)(1)), armed robbery (*id.* § 18-

2(a)(4)), and concealment of a homicidal death (*id.* § 9-3.4(a)). Thereafter, defendant was arrested and taken to the police station for additional questioning. This interview was recorded and conducted in the presence of defendant's attorney, Elder Granger.

¶ 7                     B. Granger's Disqualification as Defense Counsel

¶ 8           On April 2, 2019, the State filed a motion to disqualify Granger from representing defendant, contending Granger had both a *per se* and actual conflict of interest in concurrently representing defendant and Javar Davis-Puckett, a prosecution witness. (During their investigation in January 2019, police found defendant's car stored in Davis-Puckett's grandmother's garage.) Since Granger would have to cross-examine Davis-Puckett regarding how defendant described the shooting and his subsequent storage of defendant's car, the State argued Granger's representation of both defendant and Davis-Puckett created a conflict of interest and the only remedy would be to disqualify Granger from representing defendant. Finding Granger's concurrent representation of defendant and Davis-Puckett created a conflict of interest, the trial court granted the motion. Attorney Glenn Jazwiec entered his appearance for defendant on May 16, 2019.

¶ 9                     C. Defendant's Motion to Suppress

¶ 10          On March 3, 2021, Jazwiec filed a motion to suppress statements defendant gave during his interview with police on January 23, 2019, while accompanied by Granger. Jazwiec argued defendant did not knowingly and intelligently waive his right to remain silent and his right against self-incrimination because his attorney at the time (Granger) had a conflict and was subsequently disqualified from representing him. The trial court conducted a hearing on this motion on April 23, July 8, September 9, and September 27, 2021.

¶ 11                     1. *Granger's Testimony*

¶ 12          Granger began representing defendant on January 16, 2019, when defendant came

- 3 -

to his office to discuss being investigated for his alleged role in a murder. Defendant did not tell Granger the victim's name. Granger agreed to represent defendant if he was questioned or charged in connection with the murder. A day or two after this meeting, Granger communicated with Davis-Puckett but did not take any steps to determine who the victim of the murder was.

¶ 13        On January 22, 2019, Granger accompanied Davis-Puckett to turn himself in on an outstanding warrant unrelated to Stephens's murder. Detectives from the Winnebago County Sheriff's Office "showed up" and asked to speak with Davis-Puckett regarding a murder investigation. During this interview, Davis-Puckett was asked how he ended up in possession of defendant's car. Davis-Puckett said defendant wanted to sell his car because he was moving to Florida. A potential arrangement was made where all Davis-Puckett "had to do was take over payments and fix the sunroof." However, they never discussed the payment amounts or how payments would be made. Davis-Puckett stated defendant drove the car to his grandmother's house and backed it into the garage but took the keys. Davis-Puckett did not inspect or test drive the car. Granger stated he terminated the interview because Davis-Puckett was confronted with how his story did not make any sense and because Granger realized there could be a connection between Davis-Puckett and the information defendant provided during their initial meeting.

¶ 14        Granger worked with defendant and detectives to schedule an interview the following day (January 23, 2019), to allow defendant to "give his statement as to this investigation to, basically, attempt to clear [himself] of any involvement [in] this murder." Granger also communicated with Winnebago County Deputy State's Attorney Mike Rock regarding this. Granger explained to defendant the State was not entering into cooperation agreements unless the information provided was determined to be "good." If this occurred, the state's attorney would further discuss a cooperation agreement. Granger did not specifically discuss a potential "proffer

letter" with defendant but did explain, "[T]hey're not giving you a cooperation agreement at this time. They're not giving you—they're not giving you anything by sitting down with them."

¶ 15        When Granger arrived at the police station, detectives informed him defendant was being charged with murder. Defendant then began making statements to the detectives. Eventually, Granger instructed defendant not to make any more statements and terminated the interview because "they were trying to pin the murder on him." Granger realized "this entire matter" involved Davis-Puckett. In particular, Granger realized "[r]ight before [he] shut down the interview that the vehicle that the murder took place in could be the same vehicle that was sold to [Davis-Puckett]."

¶ 16                           2. *Rock's Testimony*

¶ 17        Rock was a deputy state's attorney in Winnebago County during the prosecution of defendant. Granger spoke with Rock about arranging a cooperation agreement with defendant. However, Marilyn Hite-Ross was the state's attorney, and she solely made decisions regarding cooperation agreements. Rock explained the first step in arranging a cooperation agreement was "essentially you spill your guts" and the State would then decide what, if anything, it would be willing to do. Rock was surprised Granger was asking about cooperation agreements, as it was known the office did not give them when a defendant was about to speak.

¶ 18               3. *Defendant's January 23, 2019, Police Interview*

¶ 19        The video of defendant's January 23, 2019, police interview was played during the suppression hearing and reviewed by this court.

¶ 20        Detective Steve Roberson read defendant his *Miranda* rights and asked if he understood them. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant asked to smoke and to contact his attorney. Defendant said he would sign the *Miranda* waiver form after having the chance to smoke. Once Granger arrived, Detective Roberson told defendant he wanted to discuss

his interaction with Stephens on the day of his murder. Detective Roberson told defendant to be honest and, in Granger's presence, read defendant his *Miranda* rights again and had defendant sign the waiver form.

¶ 21    The interrogation began, and Granger told defendant to "start with what was inaccurate that you told the deputy the first time." Defendant admitted his statement about his car being in California on January 6, 2019, was inaccurate. Defendant explained he said this at the time because he "was scared." Granger told defendant, "Let's get into it. Exactly what you told me what happened. All of it. Let's get it out. I've already talked to the state's attorney's office. The only way you can help yourself is by proffering everything you know right now."

¶ 22    Defendant said he contacted Stephens about some missing jewelry that belonged to his friend, Amber Brewer, but did not threaten him. Defendant said he drove with Whittie to Walgreens, where they met Stephens. Whittie was in the front passenger seat, and Stephens got in the back seat behind defendant. Defendant said Whittie came along for "safety reasons" because he thought it was better to have someone there "in case of a strong-arm situation." Defendant told Stephens he did not want any trouble and only wanted him to return the jewelry. Defendant turned around to talk to Stephens about who took the jewelry. Defendant then began driving, and suddenly, "there was gunfire, and [Stephens] was in the front, and that's all I know." Defendant said:

> "Where the gunfire came from, I don't know. Right before we were gonna turn, I hear some shuffling. I think I was a target in that situation. I ducked down. And then whatever happened after that was kinda like, if you experience something like that, you shut down. You shut the f*** down."

¶ 23    Defendant thought Stephens had a gun and said he "tried to shoot me first" and then said he thought Stephens was trying to shoot Whittie. Defendant said Stephens and Whittie were fighting for the gun and he heard shuffling, one shot, and then several subsequent shots. Defendant inferred Stephens had the gun and Whittie tried to grab it because Whittie was shot twice in the arm. Defendant said he did not remember much after that and explained, "All I know is I didn't do anything. It wasn't intentional. It wasn't premeditated. I didn't want anybody to get hurt. I'm not that kind of person." Defendant claimed Whittie moved to the back seat during this incident and was able to do so because "he is smaller than I am. It's almost like he jumped up. He just jumped in the back." Defendant explained Stephens ended up slumped over in the front seat. Defendant then drove off wondering "what do we do."

¶ 24    Defendant then said to Granger, "I didn't do anything." Granger responded:

"I understand that you did not do anything, but, technically, under the law, is that a criminal offense? Yes. But like I said before, you're gonna get charged with murder. You're charged with murder. It can't get any worse. We're trying to make things better right now. Tell them where you drove."

¶ 25    Defendant said he "panicked" and wanted to "get as far away as possible." Granger interjected, telling defendant he previously told him he was "just driving and driving and driving." Defendant later dropped Whittie off near Rockford Memorial Hospital and went to work. Eventually, defendant took his car to Brewer's garage (not Davis-Puckett's grandmother's) and left the gun in the back seat. Defendant said, "I don't know if it got thrown—" Granger interjected, "You said the gun was not there when you went to work." Detective David Witt tried to learn what happened to the gun through further questioning but was not successful.

¶ 26          4. *The Trial Court's Ruling on the Motion to Suppress*

¶ 27          On September 27, 2021, the trial court denied the motion to suppress the recorded interview. The court agreed Granger had a *per se* conflict of interest but did not find it would require exclusion of the recorded interview. The court found *Miranda* warnings had been provided twice and defendant knowingly and intelligently waived his right to remain silent.

¶ 28                    D. Jury Trial

¶ 29                1. *The State's New Information*

¶ 30          The jury trial began on March 22, 2022. Before jury selection commenced, the State filed a new information, charging defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) and one count of concealment of a homicidal death (*id.* § 9-3.4(a)). The first count of first degree murder alleged defendant shot a firearm, thus proximately causing Stephens's death. The second count alleged defendant shot a firearm, knowing the act created a strong probability of death or great bodily harm to Stephens. The State proceeded on an accountability theory. Jazwiec admitted they had been aware of the accountability theory "since day one."

¶ 31          Over objection, the video of defendant's January 23, 2019, interview with police, while accompanied by Granger, was played for the jury. Since we have already summarized this video, we will not do so again here. However, we will discuss this interview in connection with defendant's claims of receiving ineffective assistance from both Granger and Jazwiec.

¶ 32                    2. *The State's Case*

¶ 33                a. The Discovery of Stephens's Body

¶ 34                i. *Deputy Cesar Chavez's Testimony*

¶ 35          Winnebago County Sheriff's Deputy Cesar Chavez testified he was on duty on December 10, 2018, and responded to a call about a body that had been found in a ditch. Upon

arrival, Deputy Chavez observed a deceased white male lying face up in the ditch, with two wounds on the right side of his body. Deputy Chavez was shown a photograph of an individual who he confirmed was later identified as Stephens.

¶ 36                                    ii. *Dr. Mark Peters's Testimony*

¶ 37            Dr. Mark Peters is the forensic pathologist who performed the autopsy on Stephens's body on December 12, 2018. Dr. Peters discovered 10 gunshot wounds to Stephens's body. Dr. Peters identified the wounds with letters and testified regarding the bullets' points of entry into, and trajectory through, Stephens's body. Dr. Peters concluded, "[Stephens] *** died of multiple gunshot wounds."

¶ 38            iii. *Stipulation Regarding Gunshot Residue Found on Stephens's Left Hand*

¶ 39            Counsel stipulated that, if called to testify, Mary Wong from the Illinois State Police Crime Laboratory would testify she processed a gunshot residue kit taken from Stephens's body and detected the presence of gunshot residue on his left hand. This residue indicated Stephens "may have discharged a firearm, contacted a primer [gunshot residue] related item, or had his left hand in the environment of a discharged firearm."

¶ 40                            b. Events Leading to the Murder of Stephens

¶ 41                                    i. *Brewer's Testimony*

¶ 42            Brewer testified she grew up with defendant and had been close friends with him for almost 20 years. In November 2018, Brewer lost a wedding ring and necklace from her deceased mother. Defendant and his brother came to Brewer's house one evening and attempted to take apart her bathroom sink to see if the jewelry somehow fell into the drain. Brewer's roommate, Nate Patterson, who was an acquaintance of Stephens, was present at the time. They did not find the jewelry in the drain. The following day, Brewer filed a police report. When asked

if she told defendant who she suspected of taking her jewelry, Brewer said, "At this point Nate had already said that him and [Stephens] were the only two there at that point, and he said he didn't take it so that would be the only other answer."

¶ 43                          ii. *Tywon White's Testimony*

¶ 44          Tywon White had been friends with defendant for over 10 years. White considered defendant to be "[l]ike a brother." White described Whittie as one of his friends as well. The State questioned White regarding traveling with defendant to Beloit, Wisconsin, to purchase a 9-millimeter SCCY handgun in June or August 2018. White denied making the trip with defendant and claimed he went with Reed Nelson, who lived in Wisconsin. White claimed detectives altered his statement to say he went with defendant. When asked about the passage in which he told detectives, "[Defendant] would leave the SCCY with me to hold onto at various times for whatever reasons," White answered that he never possessed it and defendant "never possessed it, really." Whittie, however, did possess it. Thus, the passage attributed to White, reading, "[Defendant], [Whittie][,] and I would share the SCCY," was also untrue.

¶ 45          White claimed not to know anything about Stephens's murder. According to White, Whittie had the gun that day. White denied that Whittie retrieved the gun from him that day. When asked about the passage of the statement where he said, "[Whittie] *** picked up the gun from me before [Stephens] *** was killed," White answered, "No, that's not true." White testified defendant stopped by his home on the day of Stephens's murder, asking him to accompany him to try to get Brewer's jewelry back. White declined, explaining he "just didn't want to deal with it." Defendant then said he would enlist the help of Whittie, "not to harm anyone, but just to try to get the jewelry back."

¶ 46    White claimed that later that day, defendant called him and reported that "[Whittie] *** had to shoot and kill [Stephens]," and Stephens's body was "dumped in the country." Thereafter, White rode with defendant on a driving assignment to Chicago. Defendant was upset during this trip and told White "something bad went down." Defendant told White that he, Whittie, and Stephens were driving to Brewer's house when, suddenly, while defendant was turning onto Brewer's street, Stephens "lunged at [Whittie]" and a fight ensued. White offered to sell the gun, but defendant had already taken care of it.

¶ 47                                iii. *Whittie's Testimony*

¶ 48    Before trial, Whittie pled guilty to the offense of armed robbery and was sentenced to 20 years' imprisonment.

¶ 49    Whittie testified he knew defendant from recording music together at a local studio. Whittie would "hang out" with defendant, and they became "pretty close." According to Whittie, defendant picked him up at his girlfriend's house on December 7, 2018, explaining, "[Defendant] wanted me to ride with him." Whittie could not remember if defendant explained why. Whittie was the only other person in the car at the time and sat in the front passenger seat. They picked Stephens up from Walgreens, and he got in the back seat behind defendant. Whittie could not remember where they went after leaving Walgreens, but "[m]oments after" leaving the parking lot, Whittie saw a gun. When asked who had the gun, Whittie responded, "I think [Stephens] *** had the gun, sir." Upon further questioning, Whittie could not remember if defendant had the gun, as he was intoxicated and on drugs during the incident. Whittie testified that when he told police defendant had the gun, this was false. Whittie admitted he was originally charged with first degree murder and provided a statement as part of a plea deal.

¶ 50    Whittie testified that as defendant began driving away from Walgreens with Stephens in the back seat, "[a] gun was upped, and I quite don't remember from there[.] All I know is I got shot. *** I got shot somehow, sir." When asked if defendant "ever" had a gun, Whittie answered, "I do not think so, sir." When confronted with telling police in his statement that "the victim, Jaime Stephens, did not have a gun," Whittie responded, "I quite don't remember, sir." When confronted with telling police, "[Defendant] shot me," Whittie responded, "I quite do remember, sir," and clarified this was because "defendant had a firearm in his hand." However, moments later, Whittie testified, "I don't know if [defendant] had a firearm or not, sir." Whittie continued to be evasive in his testimony and maintained he did not know who shot Stephens, despite previously telling detectives defendant shot him. Whittie testified he lied to detectives when he told them defendant shot Stephens and denied he was there to get some jewelry back, as he was there "just to ride."

¶ 51    According to Whittie, the shots were fired in the car approximately "five to ten minutes" after Stephens got inside. Whittie remembered Stephens punching him and defendant, then "grabbing a gun and shooting *** [Stephens]," but on cross-examination, he said, "I don't think so" when asked if he had a "physical confrontation" with Stephens. When asked if he "[ ]ever had the gun" or "[ ]ever shot at all," Whittie answered, "No, sir." Whittie thought he went to the back seat after being shot and that Stephens was face down in the front seat. After the incident, defendant drove to a remote area, where he deposited Stephens's body. Defendant then dropped Whittie off a block away from the hospital.

¶ 52            c. The Jury's Verdict and Defendant's Sentence

¶ 53    The jury found defendant guilty of counts II and III. (Count I had been previously dismissed by the State.) Defendant filed a motion for a judgment notwithstanding the verdict or,

alternatively, for a new trial, which the trial court denied. The court sentenced defendant to a total of 60 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court denied.

¶ 54        This appeal followed.

¶ 55                                        II. ANALYSIS

¶ 56        On appeal, defendant argues (1) the trial court erred in denying his motion to suppress statements made during the recorded police interview, contending before this court that he received ineffective assistance from his initial attorney (Granger), rendering his statements involuntary, due to the eliciting of highly incriminating statements in violation of the attorney-client privilege and in the absence of a cooperation agreement with the State (and while operating under a *per se* conflict of interest); (2) his trial counsel (Jazwiec) provided ineffective assistance by only basing this motion to suppress on the conflict of interest and not on the initial attorney's conduct during the interview, which rendered defendant's statements involuntary; (3) the court erred in denying his motion to suppress evidence of statements he made during the earlier, unrecorded police interview; (4) his trial counsel provided ineffective assistance by failing to raise and argue the affirmative defense of self-defense; and (5) the cumulative effect of these errors deprived him of a fair trial. For the reasons explained below, we agree with defendant that he received ineffective assistance from his initial counsel at his recorded police interview (such that the court erred in denying the motion to suppress) and from his trial counsel in connection with the motion to suppress and conclude these defects require reversal of his convictions and remand for a new trial.

- 13 -

¶ 57        A. Allegation of Ineffective Assistance of Counsel at Recorded Police

Interview Is Not Forfeited

¶ 58        Regarding the January 23, 2019, recorded police interview, defendant contends Granger performed ineffectively in practically eliciting a confession from him. "Rather than advise [defendant] during the interrogation, Granger conceded that [defendant] had committed crimes, encouraged him to make incriminating statements, and advised detectives when [his] statement contradicted the one he previously made to counsel." Defendant urges this court to find Granger's conduct, eliciting incriminating statements in violation of the attorney-client privilege and in the absence of an agreement with the State (and while operating under a *per se* conflict), to be "deficient." Defendant also contends Granger's conduct "prejudiced" him, in that "were it not for the admission of [his] statement, it is reasonably likely that the jury would have found [him] not guilty of murder." Granger's ineffective assistance rendered defendant's statements "involuntary," such that the trial court erred in denying the motion to suppress. Additionally, defendant argues his trial counsel (Jazwiec) was ineffective for basing the motion to suppress solely on Granger's conflict of interest and not including Granger's conduct during the interview.

¶ 59        In response, the State contends defendant's arguments on appeal are forfeited, as they "differ from the basis for the motion to suppress, which argued only that the statement should be suppressed due to Attorney Granger's conflict of interest." Moreover, the absence in caselaw at the time of trial of an "objective standard" applicable to an attorney's representation at a custodial interrogation "is the downfall of this argument in the context of ineffective assistance of counsel." Additionally, Granger "made a reasonable strategic decision to encourage defendant to tell his story in exchange for the possibility of a cooperation agreement later on," and defendant "was not prejudiced by the statements he gave to the police during the interrogation" in any event,

particularly in that he "did not confess to the police." As defendant was not prejudiced by the presentation of these statements to the jury, trial counsel was not ineffective in making the "tactical decision" to base the motion to suppress solely on Granger's conflict of interest.

¶ 60        In reply, defendant acknowledges his arguments on appeal with respect to the denial of the motion to suppress were not "identical" to those he asserted in the trial court but argues this does not result in the forfeiture of his arguments before this court. Defendant contends his arguments before us were properly preserved because, as in the trial court, he "is still arguing that his statement was involuntary because Granger provided ineffective assistance" and "the crux of the factual and legal basis is the same on appeal" as it was in the trial court.

¶ 61        We conclude defendant's arguments on appeal as to the impropriety of the trial court's denial of his motion to suppress his January 23, 2019, recorded police interview are not forfeited, despite their not being identical to the arguments for suppression he raised in the trial court. "In order to preserve an argument, for the purpose of appeal, from a jury trial, the challenge must be presented to the trial court not only at the motion to suppress stage, but it must also be included in the defendant's post-trial motion." *People v. Johnson*, 250 Ill. App. 3d 887, 893 (1993). "The failure to properly preserve an issue for review results in forfeiture." *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7. However, our supreme court has observed that "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). Defendant compares the present case to *People v. Salamon*, 2022 IL 125722, ¶ 53, where the defendant argued the trial court erred by declining to suppress an inculpatory statement allegedly elicited through coercive behavior by detectives. The State contended the defendant's argument was forfeited in that it was

not the basis for suppression he argued before the trial court. *Id.* ¶ 57. Rather, before the trial court, the defendant argued his statement should be suppressed because "the detectives improperly reinitiated interrogation after he had invoked his right to counsel and that his statutory right to a telephone call was violated." *Id.* ¶ 58.

¶ 62  In *Salamon*, the supreme court found the defendant's claim preserved for review. *Id.* ¶ 59. Specifically, the court concluded:

> "Considering the evidence and arguments presented at the suppression hearing, *** the factual and legal bases supporting defendant's argument have not changed. The crux of defendant's argument in the trial court and before this court is that his statement was rendered involuntary because he was detained for approximately 24 hours and deprived of the ability to contact an attorney even though he repeatedly invoked his right to counsel and requested access to a telephone in order to exercise that right." *Id.* ¶ 63.

¶ 63  Likewise, here, while defendant's arguments for suppression before the trial court and this court are not identical, they pertain to the need for his statements to have been suppressed due to their involuntariness resulting from Granger's ineffective assistance. Defendant argued in the trial court that Granger had a *per se* conflict through concurrently representing defendant and a prosecution witness, amounting to ineffective assistance and rendering his statements involuntary. Before this court, however, defendant argues Granger violated the attorney-client privilege by actively eliciting incriminating statements, in the absence of an agreement with the State, during the recorded police interview, also amounting to ineffective assistance and rendering

- 16 -

his statements involuntary, and trial counsel was ineffective for failing to raise this additional basis for the involuntariness, and need for suppression, of these very statements. (We also note defendant cites, in his opening brief, principles expounded in the American Bar Association Standards for Criminal Justice pertaining to the obligation of a defense attorney to "cease representation if a conflict of interest exists.") The factual and legal basis, and overall "crux," of defendant's argument before both courts is that his statements were rendered involuntary due to Granger's ineffective assistance and, therefore, should have been suppressed. Thus, the issue of the propriety of the trial court's denial of defendant's motion to suppress the January 23, 2019, police interview was preserved for appellate review.

¶ 64          B. Reversal of Defendant's Convictions and Remand for a New Trial Is Required

¶ 65          1. *Ineffective Assistance Due to Counsel's Per Se Conflict of Interest*

¶ 66          The trial court eventually disqualified Granger from representing defendant, given the *per se* conflict inherent in his concurrent representation of defendant and Davis-Puckett. However, the court did not find this conflict required the suppression of defendant's January 23, 2019, police interview. For the reasons stated below, we conclude Granger rendered ineffective assistance at this interview by virtue of the *per se* conflict such that the court erred in denying the motion to suppress.

¶ 67          At the outset, we note this argument of ineffective assistance of counsel relates to counsel's conduct at a pretrial interrogation, not the trial itself, to which the sixth amendment right to counsel has firmly attached. See U.S. Const., amend. VI. Nevertheless, our supreme court has recognized that "[t]he State [constitutional] due process guarantee (article I, section 2) provides the general basis for an accused's right to the assistance as well as presence of counsel during any

custodial interrogation." *People v. McCauley*, 163 Ill. 2d 414, 441 (1994); see Ill. Const. 1970, art. I, § 2. Later, in a passage citing *McCauley*, the appellate court noted:

> "[A] defendant's right to counsel under the fifth amendment does not include the same guarantee of effective assistance of counsel contained in the sixth amendment but, rather, only protects a defendant from coerced confession. *However, we believe that the Illinois Constitution entitles those subject to custodial interrogation the right to conflict-free counsel*. Ill. Const. 1970, art. I, §§ 2, 10. *** This right has not been found satisfied by the mere formality of the appointment of an attorney, but has required effective representation." (Emphasis added.) *People v. Rish*, 344 Ill. App. 3d 1105, 1112-13 (2003).

¶ 68 The right to the effective assistance of counsel, at least so far as the Illinois Constitution is concerned, has therefore been understood to include the right to conflict-free representation during a custodial interrogation. Importantly, "[i]f a *per se* conflict is found, a defendant need not show that the conflict affected the attorney's actual performance." *People v. Fields*, 2012 IL 112438, ¶ 18. In this regard:

> "The supreme court has identified three situations in which a *per se* conflict of interest exists: '(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) *where defense counsel contemporaneously represents a prosecution witnes*s; and (3) where defense counsel was a former prosecutor who had been personally

involved with the prosecution of defendant.' " (Emphasis added.) *People v. Acevedo*, 2018 IL App (2d) 160562, ¶ 18 (quoting *Fields*, 2012 IL 112438, ¶ 18).

¶ 69    Here, it is undisputed Granger had established concurrent attorney-client relationships with defendant and Davis-Puckett at the time of defendant's custodial interrogation on January 23, 2019. It is also undisputed Granger's concurrent representation of defendant and a State witness constituted a *per se* conflict of interest notwithstanding that it arose prior to trial and in the context of defendant's custodial interrogation. A defendant's right to counsel includes a right "to counsel of choice." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 79. Accordingly, "a defendant may waive the right to a conflict-free counsel." *Id.* Nevertheless, "a defendant's right to choice of counsel is subject to certain limitations, including a trial court's ' "substantial latitude" ' to refuse to allow a defendant to waive his counsel's actual or potential conflict of interest. [Citation.]" *Id.* Here, however, the trial court did not allow defendant to waive his right to conflict-free representation and removed Granger from further participation in the case. Granger operated under a *per se* conflict of interest at defendant's recorded police interview and provided ineffective assistance in so doing, rendering defendant's statements involuntary.

¶ 70    2. *Ineffective Assistance Due to Violating Attorney-Client Privilege*

*and Eliciting Incriminating Statements*

*During Defendant's Recorded Police Interview*

¶ 71    While Granger's *per se* conflict of interest in concurrently representing a prosecution witness and defendant during the latter's recorded police interview itself constituted ineffective assistance of counsel, rendering defendant's statements involuntary, we find Granger's action in violating the attorney-client privilege to elicit highly incriminating statements from

- 19 -

defendant (with no cooperation agreement from the State in place) also meets this standard. This, too, required the trial court to have suppressed this interview and requires this court to reverse defendant's convictions and remand for a new trial.

¶ 72      This court has summarized the familiar standard applicable to assessing claims of ineffective assistance of counsel as follows:

>      "To establish a claim of ineffective assistance of counsel, a defendant must satisfy the standard set forth in *Strickland v. Washington*, 466 U.S. 668 [(1984)]. First, the defendant must prove that counsel made errors so serious, and counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment to the United States Constitution (U.S. Const., amend. VI).

>      Second, the defendant must establish prejudice—that is, she must prove that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Further, this prejudice prong of the *Strickland* test entails more than an 'outcome-determinative' test; the defendant must also show that counsel's deficient performance rendered the result of the trial unreliable *or the proceeding fundamentally unfair*." (Emphasis added.) *People v. Little*, 335 Ill. App. 3d 1046, 1052 (2003).

¶ 73        After noting how the appellate and supreme courts have established a defendant's state constitutional right to the effective assistance of counsel during a custodial interrogation, the appellate court in *Rish* adopted the *Strickland* standard (see *Strickland v. Washington*, 466 U.S. 668 (1984)) for a claim of ineffective assistance of counsel rendered in that context. *Rish*, 344 Ill. App. 3d at 1114. The court explained, "We adopt this test for ineffective assistance claims under the Illinois Constitution since many courts have substantial experience applying it, from its wide use as the standard for ineffective assistance under the sixth amendment to the [United States] Constitution." *Id.*

¶ 74        Applying this standard to Granger's conduct during defendant's January 23, 2019, recorded police interview, irrespective of the *per se* conflict addressed above, we conclude he rendered ineffective assistance. Granger performed deficiently in actively eliciting highly incriminating information in violation of the attorney-client privilege and with no agreement with the State secured in advance. Granger effectively became an interrogator of his own client, who was charged with one of the most serious crimes, during his recorded police interview. Granger prodded defendant at the beginning of the interview to "get into it" and tell the detectives "exactly what you told me what happened." Granger admonished defendant he needed to share "all of it" and "everything you know right now" in order to "help yourself." Granger also told defendant in the presence of detectives that he "technically" committed a "criminal offense." Perhaps even worse, Granger confronted defendant in the presence of detectives about his apparently inaccurate accounts of where he drove after the murder and what happened to the murder weapon.

¶ 75        We also conclude these actions, so manifestly adverse to defendant's interests, were prejudicial to defendant. Defendant's statements in the presence of police, at the insistence of his own attorney, placing himself inside the vehicle in which the murder of an acquaintance, who he

picked up from the store for the purpose of confronting about stealing Amber's jewelry, occurred, on the date and at the time, and describing how the victim was somehow shot in the back seat either by defendant himself or by the associate he recruited for "safety reasons" to accompany him (and who needed to be prepared to respond in the event of a "strong-arm situation"), were tantamount to confessions (with no agreement from the State in advance). Confessions have been appropriately recognized as "the most powerful piece[s] of evidence the State can offer," whose "effect on a jury is incalculable." *People v. R.C.*, 108 Ill. 2d 349, 356 (1985). This is especially so here, in that the State prosecuted defendant on a theory of accountability, pursuant to which his guilt was not dependent on the jury finding *he* was the shooter. As Justice McDade noted in her special concurrence in *People v. Jackson*, 2014 IL App (3d) 120239, ¶ 124 (McDade, J., specially concurring):

> "There is no more damning evidence that can be presented against a criminal defendant than his or her own confession of guilt. If the confession is on audio/video tape and the jury can see it, it can become even more potent. The court's finding that a confession was voluntary reduces, as a practical matter, the obligation to carefully evaluate its reliability. There is no need for the fact finder to weigh the evidence against the defendant—he confessed. Nor is there any need to consider anything raised in defense—she confessed. All of the processes set up to test the strength and persuasiveness of the extrinsic evidence, if any, are obviated—he confessed."

As Justice McDade also noted, quoting from Justice William Brennan's dissenting opinion in *Colorado v. Connelly*, 479 U.S. 157 (1986):

"'Triers of fact accord confessions such heavy weight in their determinations that "the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained." [Citations.] No other class of evidence is so profoundly prejudicial. [Citation.]'" *Jackson*, 2014 IL App (3d) 120239, ¶ 125 (McDade, J., specially concurring) (quoting *Connelly*, 479 U.S. at 182 (Brennan, J., dissenting, joined by Marshall, J.)).

This court concludes, given the uniquely probative and prejudicial nature of confessions, Granger's practically eliciting defendant's confessions to his involvement in Stephens's murder was prejudicial, particularly in that it made the proceeding fundamentally unfair. See *Little*, 335 Ill. App. 3d at 1052; *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988) (noting the "extreme probative weight" of confessions).

¶ 76        Aside from our application of the *Strickland* standard as envisaged by *Rish*, we find the two out-of-state cases defendant cites particularly persuasive in illustrating the ineffectiveness of Granger's assistance during the recorded police interview. In *Wayrynen v. Class*, 1998 SD 111, ¶ 4, 586 N.W.2d 499, the defendant's attorney arranged a meeting with the state's attorney for his client to confess. The South Dakota Supreme Court concluded the defendant received ineffective assistance of counsel when his attorney assisted the police in questioning and elicited additional information when there was no prior agreement with the state. *Id.* ¶¶ 17-21. Similarly, in *Claudio v. Scully*, 982 F.2d 798, 800 (2d Cir. 1992), the defendant, a suspect in a murder case, upon his attorney's recommendation, gave a statement confessing to murder when there was no plea agreement in place. The Second Circuit held appellate counsel was ineffective for not raising the

issue on appeal when the defendant's attorney "actively participated in the questioning" during his interview and the district attorney's press conference thereafter. *Id.* at 800-05.

¶ 77    Granger's conduct during defendant's recorded police interview bears important similarities to that of the attorneys in the aforementioned cases. As with the defendant's counsel in *Wayrynen* and *Claudio*, Granger welcomed defendant as a client seeking advice and guidance regarding the very serious criminal charges he was facing. See *Wayrynen*, 1998 SD 111, ¶ 20; *Claudio*, 982 F.2d at 799-800. After learning information from defendant about Stephens's murder, Granger approached the state's attorney's office and discussed the possibility of a cooperation agreement should defendant wish to speak about the murder but was told none would be forthcoming. See *Claudio*, 982 F.2d at 800. There was no plea and/or cooperation agreement in place before Granger arranged a meeting between detectives and defendant to share what he knew about the murder (on the remote possibility he would be offered a cooperation agreement). See *Wayrynen*, 1998 SD 111, ¶ 20; *Claudio*, 982 F.2d at 800. Moreover, Granger actively elicited highly incriminating information, in violation of the attorney-client privilege, effectively becoming an interrogator of his own client in the process. See *Wayrynen*, 1998 SD 111, ¶ 4 (noting the defendant's attorney "assisted the police in questioning [the defendant] by drawing out additional information"); *Claudio*, 982 F.2d at 800 (noting the defendant's attorney "actively participated in the questioning" that precipitated the defendant's confession).

¶ 78    3. *Ineffective Assistance in Connection With the Motion to Suppress*

¶ 79    This court likewise concludes trial counsel (Jazwiec) rendered ineffective assistance in confining his motion to suppress to Granger's *per se* conflict and not including his conduct during the interview as an additional basis for suppression. Our supreme court has required that:

"[W]here an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

The unargued basis for suppression was meritorious, as it constituted an independent ground for concluding Granger rendered ineffective assistance during defendant's recorded police interview. Given the uniquely probative and prejudicial nature of confessions, there is a reasonable probability defendant would not have been convicted had Granger not practically elicited his confession to his involvement in Stephens's murder. Consequently, Jazwiec rendered ineffective assistance in failing to argue Granger's conduct during the recorded police interview as an additional basis for its suppression.

¶ 80 4. *The Trial Court Erred in Denying Defendant's Motion to Suppress and Its Error Was Not Harmless Beyond a Reasonable Doubt*

¶ 81 As defendant received ineffective assistance of counsel and thus was deprived of one of his constitutional rights during his recorded police interview, the trial court erred in denying his motion to suppress. In particular, the court erred by concluding that merely because defendant delivered his statements "voluntarily" in the sense of having been informed of his constitutional rights prior to the interview beginning, Granger's *per se* conflict did not require the suppression of his statements. To be clear, the "voluntariness" of defendant's statements in the sense of their being delivered in the absence of coercive conduct by the detectives has never been at issue.

Rather, the connotation of "voluntariness" defendant advances before this court is in relation to making these highly incriminating statements having been afforded ineffective assistance by Granger through both his *per se* conflict and his prodding of defendant to reveal confidential information obtained in the confines of the attorney-client relationship and with no cooperation agreement with the State arranged in advance.

¶ 82        Our supreme court has enunciated three approaches for determining whether a constitutional error is harmless beyond a reasonable doubt: " '(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative.' " *People v. Coleman*, 2021 IL App (1st) 172416, ¶ 104 (quoting *People v. Patterson*, 217 Ill. 2d 407, 428 (2005)). "Each approach need not be applied or satisfied." *People v. Mazar*, 333 Ill. App. 3d 244, 253 (2002), *abrogated on other grounds by People v. Breedlove*, 213 Ill. 2d 509 (2004).

¶ 83        There is an ample probability the trial court's erroneous admission of defendant's recorded interview contributed to his convictions. By admitting defendant's interview, the jury was able to hear him, at his own attorney's insistence, place himself inside the vehicle on the date and at the time when an acquaintance was murdered, and describe how the victim was somehow shot in the back seat of his vehicle either by defendant or by the associate he recruited for "safety reasons" to accompany him to confront the victim. As we explained above, these statements were tantamount to confessions, recognized as "the most powerful piece[s] of evidence the State can offer," and whose "effect on a jury is incalculable" (*R.C.*, 108 Ill. 2d at 356), especially so here, where the State prosecuted defendant on a theory of accountability pursuant to which his guilt was not dependent on the jury finding *he* was the shooter. Given the uniquely probative and prejudicial

nature of confessions, in conjunction with defendant having been prosecuted under an accountability theory, we conclude the trial court's erroneous admission of his recorded interview was not harmless beyond a reasonable doubt.

¶ 84                        5. *Retrial Is Not Precluded by Double Jeopardy*

¶ 85        Finally, this court concludes retrying defendant would not be precluded by double jeopardy. "The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings, but retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 20. A retrial would be appropriate "if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction." *Id.* ¶ 21. As to this consideration:

> " 'In reviewing the sufficiency of the evidence in a criminal case,
> our inquiry is whether, after viewing the evidence in the light most
> favorable to the prosecution, any rational trier of fact could have
> found the essential elements of the offense beyond a reasonable
> doubt.' [Citation.] All reasonable inferences from the evidence must
> be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL
> 121453, ¶ 37.

¶ 86        Here, the evidence is sufficient to sustain defendant's convictions for first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) and concealment of a homicidal death (*id.* § 9-3.4(a)). The evidence adduced at trial established either defendant (prosecuted under an accountability theory) or Whittie shot Stephens 10 times, thereby killing him, while he was in the back seat of defendant's car and discarded his deceased body. This is more than sufficient for a rational trier of

fact to find the essential elements of the offenses met beyond a reasonable doubt. Accordingly, retrial is not precluded by double jeopardy. However, any retrial must be conducted without defendant's improperly admitted January 23, 2019, recorded police interview.

¶ 87                                   III. CONCLUSION

¶ 88        For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 89        Reversed and remanded.

*People v. Parks*, 2025 IL App (4th) 230597

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 19-CF-211; the Hon. Ronald J. White, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Sarah Inskeep, State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |